UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

XIN WANG,

                      Plaintiff,

        -v-

ESSENCE INTERNATIONAL FINANCIAL
HOLDINGS LIMITED (A/K/A SDIC
SECURITIES INTERNATIONAL FINANCIAL
HOLDINGS LIMITED),

                   Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _5/19/2026___

**REPORT AND
RECOMMENDATION**

24-CV-8204 (VEC) (HJR)

**HENRY J. RICARDO, United States Magistrate Judge.**

**To the Honorable Valerie E. Caproni, United States District Judge:**

Plaintiff Xin Wang ("Plaintiff"), proceeding pro se, brings this action against defendant Essence International Financial Holdings Limited ("Essence" or "Defendant") for insider trading in connection with a take-private transaction involving Highpower International, Inc. ("Highpower" or the "Company"). Essence moves to dismiss Plaintiff's Second Amended Complaint with prejudice under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Additionally, Plaintiff seeks leave to file a Third Amended Complaint. For the reasons described below, the undersigned respectfully **RECOMMENDS** that Essence's Motion to Dismiss be **GRANTED** and that Plaintiff's request to file a Third Amended Complaint be **DENIED**.

1

## I.    BACKGROUND

### A.    Factual Background

Plaintiff's claims arise from the privatization of Highpower, a rechargeable battery developer and manufacturer based in China.  Second Amended Complaint ("SAC"), ECF No. 41, ¶¶ 1, 14.  Before this transaction (the "Merger"), Highpower shares were publicly traded on NASDAQ, *id.* ¶ 14, and Plaintiff was a shareholder. *Id.* ¶ 12.  Plaintiff alleges that Essence falsely represented that it had no plan to relist Highpower on a Chinese exchange soon after taking it private.  *Id.* ¶ 4.  This same transaction is also the subject of two pending lawsuits in Delaware Chancery Court.[1]  *Id.* ¶¶ 17–18.  Essence is not a party to either of these Delaware lawsuits, but Plaintiff relies on certain filings from these cases in his complaint.  *Id.* ¶ 68.

Essence is a company incorporated in Hong Kong that engages in investment banking and asset management.  *Id.* ¶ 13.  Essence is the parent company of several wholly-owned subsidiaries that participated in the Merger, including Essence International Financial Holdings (Hong Kong) Limited ("Essence Hong Kong"), Essence International Capital Limited ("Essence Capital"), Essence Asset Management (Hong Kong) Limited, and Essence International Advanced Products and Solutions SPC ("Essence SPC").  *Id.*  Plaintiff refers to these companies collectively as the "Essence Group."

---

[1] These two suits are (1) an appraisal action for dissenting shareholders against Highpower and (2) a shareholder action for breach of fiduciary duty against Highpower's directors.  *See Kevin X. Lu v. Highpower Int'l, Inc.*, No. 2020-0040-PAF (Del. Ch.); *John Styslinger & Dale Raimann v. Dang Yu (George) Pan*, No. 2020-0651-PAF (Del. Ch.).

2

On June 2, 2018, Highpower's CEO and Chairman (the "Founders") submitted a non-binding bid to acquire the Company, inviting Essence to join the "Buyer Group" that would accomplish the acquisition. *Id.* ¶ 19. On February 12, 2019, the Essence board approved its participation in the Buyer Group, which consisted of the Essence Group and the Founders. *Id.* ¶¶ 22–23. The Founders then entered into a consortium agreement with the Essence Group in which the parties agreed to cooperate and to vote for acquisition of the Company. *Id.* ¶¶ 21– 22. The Buyer Group entered into a definitive merger agreement with Highpower on June 28, 2019 to acquire the Company for $4.80 per share, at an implied valuation of $75.3 million. *Id.* ¶ 23. As the Buyer Group already owned 32.6% of Highpower at the time, this transaction involved acquiring the remaining publicly held shares. *Id.*

To accomplish the Merger, Essence Group and the Founders jointly filed a 13E-3 Transaction Statement ("13E-3") under Section 13(e) of the Securities Exchange Act of 1934, which contained the Definitive Proxy Statement (the "Proxy Statement"), on September 27, 2019. *Id.* ¶ 25. Central to Plaintiff's claims, the Proxy Statement represented that "the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets." *Id.* ¶ 38.

3

On October 29, 2019, Highpower held an Extraordinary Shareholder Meeting at which a majority of the outstanding shares, including those held by Plaintiff, voted in favor of the Merger. *Id.* ¶ 28. By the Merger's closing date of October 31, Plaintiff had increased his beneficial ownership to 60,000 shares, for which he received $288,000.00. *Id.* ¶ 12. Essence filed a disclosure confirming that the Merger had been approved of and closed on October 31, 2019, and that each share of common stock was converted into the right to receive $4.80 in cash. *Id.* ¶ 62. Highpower's stock was delisted from NASDAQ on November 1, 2019. *Id.* ¶ 29.

Between February and October 2020, Highpower reorganized its corporate structure to meet Chinese regulatory requirements for a public offering, and Shenzhen Highpower Technologies Ltd. ("Shenzhen Highpower") became the holding company for Highpower. *Id.* ¶ 31. On January 7, 2021, an affiliate of the Essence Group, Essence Securities Co., Ltd., acting as the IPO underwriter for Shenzhen Highpower, filed an application to list on the Shenzhen stock exchange in China. *Id.* ¶ 32. Shenzhen Highpower subsequently filed its IPO on the Shenzhen stock exchange at a value of $602 million—approximately eight times Highpower's Merger valuation less than two years earlier. *Id.* ¶ 66.

### B.    Procedural Background

Plaintiff filed the initial complaint on October 25, 2024 and an Amended Complaint on November 25, 2024. ECF Nos. 1, 12. The Amended Complaint asserted claims for securities fraud and insider trading based upon Sections 10(b)

4

and 20A of the Securities Exchange Act of 1934 (the "Exchange Act").[2]  Essence moved to dismiss the Amended Complaint on February 10, 2025.  ECF No. 20.  The undersigned issued a Report & Recommendation ("R&R") on the Motion to Dismiss, which the District Judge adopted in part and modified in part on August 26, 2025.  ECF Nos. 33, 38.  Plaintiff's Section 10(b) claims were dismissed with prejudice as barred by a statue of repose.  ECF No. 38 at 3.[3]  Plaintiff's Section 20A claims were dismissed without prejudice, permitting Plaintiff to replead to cure the deficiencies identified in the Court's August 26 Order, which included the failure to sufficiently plead an alter ego or agency theory supporting Defendant's liability.  *Id.* at 8.

Plaintiff filed a Second Amended Complaint ("SAC") on October 17, 2025.  ECF No. 41.  The SAC included the same claims under Sections 10(b) and 20A of the Exchange Act, with additional facts to support his agency and alter ego theories in relation to the Merger.  SAC ¶¶ 19–61.  On November 14, 2025, Defendant moved to dismiss the SAC, ECF No. 48, and filed a supporting memorandum of law, ECF No. 49.  Plaintiff filed his opposition to the motion on December 5, 2025.  ECF No. 59 (the "Opposition").  Defendant filed a reply on December 23, 2025.  ECF No. 60.  Additionally, Plaintiff filed a motion requesting leave to file a third amended complaint asserting a new common law claim for fraudulent misrepresentation, ECF No. 65, after initially raising this suggestion in his response to the motion to dismiss, Opposition at 14.

---

[2] Plaintiff's claims arose under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Section 20A of the Exchange Act, 15 U.S.C. § 78t–1.

[3] Pages cited in court filings refer to the ECF-generated pagination.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(6) Standard

When deciding a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Wang v. Cloopen Group Holding Limited*, 661 F. Supp. 3d 208, 222 (S.D.N.Y. 2023). However, "this requirement 'is inapplicable to legal conclusions.'" *In re Turquoise Hill Resources Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 194 (S.D.N.Y. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint will not survive a motion to dismiss "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'," *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 235 (S.D.N.Y. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), without "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In other words, "[t]he plausibility requirement 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim].'" *Turquoise Hill*, 625 F. Supp. 3d at 194 (quoting *Twombly*, 550 U.S. at 556).

### B.    Pleading Standards

A securities fraud complaint alleging misstatements is subject to two heightened pleading requirements. *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012). "First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'" *Cannavest*, 307 F. Supp. 3d. at 236 (quoting

Fed. R. Civ. P. 9(b)).  As such, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

Because Plaintiff attempts to hold Defendant liable for the alleged Section 20A violation through an agency or alter ego theory, the Court must also determine whether the heightened Rule 9(b) pleading standard applies to Plaintiff's agency and alter ego allegations.  Defendant correctly asserts that "[w]here the veil-piercing claims are based on allegations of fraud, [the] heightened pleading standard of Rule 9(b) is the lens through which those allegation[s] must be examined." *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 425 (S.D.N.Y. 2003).  However, in considering allegations of an agency relationship, decisions in this district have distinguished between those cases where the agency itself is part of the alleged fraud, *Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996), and those where the agency relationship is not part of the underlying fraud, *Elbit Systems, Ltd. v. Credit Suisse Group*, 917 F. Supp. 2d 217, 225 (S.D.N.Y. 2013).[4]  Here, Plaintiff does not contend that there were

---

[4] The Court in *Kolbeck* reasoned that "[w]hen an implied agency relationship is allegedly part of the fraud, the circumstances constituting the fraud on the part of the purported principal include both the facts constituting the underlying fraud and the facts establishing the agency relationship." *Kolbeck*, 923 F. Supp. at 569 (internal citations omitted).  The plaintiffs in *Kolbeck* claimed that the asserted principal-agent relationship was, itself, fraudulent, and used to facilitate commodities fraud.  *Id.*  In contrast, *Elbit* concerned allegations of fraud against a subsidiary, and the plaintiff sought to hold the parent company liable for its subsidiary's actions.  *Elbit*, 917 F. Supp. 2d at 221.  On those facts, the court determined that because the agency relationship was "not itself alleged to

misrepresentations about any alleged agency relationship between Essence and its subsidiaries. *Id.* This is, instead, a case where agency is simply a basis upon which Plaintiff seeks to impose vicarious liability. Therefore, Plaintiff must satisfy the heightened Rule 9(b) pleading standard for his alter ego claims, but only the ordinary Rule 8 pleading standard for his agency claims.

Second, the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b)(1)(b), also imposes heightened pleading standards for securities fraud complaints, requiring a plaintiff "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). A complaint will only survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Defendant does not contend Plaintiff's agency or alter ego allegations must meet this heightened standard, which applies to pleading the underlying securities violation.

### C.    Materials to Consider

When deciding a Rule 12 motion, a court may consider the facts alleged in the complaint, documents attached to, referenced in, or "integral" to the complaint, or matters of which judicial notice may be taken. *See Wang v. Cloopen Group Holding*

---

have been a fraud," it would analyze the agency question using "the ordinary pleading standard." *Id.* at 225.

*Limited*, 661 F. Supp. 3d 208, 223 (S.D.N.Y. 2023); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A document is deemed integral to the complaint when the plaintiff either possessed or knew about it and the complaint "relies heavily upon its terms and effect." *See id.* (*quoting Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). Further, the court may take judicial notice of "public disclosures that must be filed with the SEC and documents that both bear on the adequacy of SEC disclosures and are public disclosure documents required by law." *Wang*, 661 F. Supp. 3d at 223 (internal quotations omitted).

Ordinarily, "when matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56'." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (citing *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988)).

Finally, submissions made by *pro se* plaintiffs are held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotations omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts are "obligated to construe a *pro se* complaint liberally"). As a result, the court may consider factual allegations that appear in a *pro se* plaintiff's motion papers as well as in his pleadings. *See, e.g., Freud v. N.Y.C. Dep't of Educ.*, No. 21-CV-2281 (MKV), 2022 WL 889213, at *4 (S.D.N.Y. Mar. 25, 2022) (courts "may also consider factual statements made in the *pro se* Plaintiff's opposition to

the motion to dismiss") (citing *Walker v. Schult,* 717 F.3d 119, 122 n.1 (2d Cir. 2013)).

## III.    DISCUSSION

Plaintiff alleges that the Merger was a fraudulent "flip" scheme in which Essence made misstatements to acquire Highpower's shares at an artificially low price, while secretly planning to relist Highpower's assets on a Chinese stock market at a much higher value. SAC ¶ 3. Plaintiff alleges that Essence had a plan in place to relist Highpower on a Chinese stock market before entering into the Merger, and seeks to hold Defendant liable under Section 20A of the Exchange Act, which imposes liability on anyone who violates another provision of the law, including Section 10(b), by purchasing or selling a security while in possession of material, nonpublic information. SAC ¶¶ 4, 8; 15 U.S.C. § 78t-1; 15 U.S.C. § 78j(b).

In reviewing the First Amended Complaint, the Court dismissed Plaintiff's 10(b) claim with prejudice as time-barred. ECF No. 38 at 3. Thus, while Plaintiff's 10(b) allegations remain relevant to his 20A claim, Plaintiff can no longer present an independent 10(b) claim. Plaintiff's 20A claim was dismissed without prejudice and has therefore been repled. *Id.* at 8. Although it was untimely, the Court found that the 10(b) claim alleged in the First Amended Complaint was otherwise sufficient. *Id.* at 3. Additionally, the Court found that Plaintiff could use the time-barred 10(b) claim as predicate violation for a Section 20A claim and had also adequately pled a "sale" as required by Section 20A. *Id.* at 3, 7.

10

The primary deficiency that the Court identified in the First Amended Complaint was that Plaintiff sought to hold Defendant Essence liable for purchasing securities while in possession of material, nonpublic information, when it was a different legal entity, HPJ Parent, that directly purchased Plaintiff's securities. *Id.* at 4. Thus, the central question in assessing the legal sufficiency of the Second Amended Complaint is whether Plaintiff adequately pleads whether HPJ Parent acted as Defendant's alter ego or agent in carrying out the Merger, which would provide a basis to hold Essence liable for the purchases made by HPJ Parent.

### A.    New York Choice of Law Rules Determine the Governing Alter Ego Standard

As a threshold matter, it is necessary to decide which jurisdiction's alter ego or "veil piercing" law to apply. Defendant asserts, and Plaintiff does not dispute, that at the time of the purchase, the ownership structure of Essence and its subsidiaries was as follows: Essence wholly owned Essence Hong Kong and Essence International Capital. ECF No. 49 at 11.[5] Essence Hong Kong wholly owned Essence SPC. *Id.* Essence SPC shared ownership of HPJ Parent, the special

---

[5] For ease of reference, this R&R cites Defendant's memorandum of law, ECF No. 49 at 11, as the source for the relevant corporate structure. That filing, in turn, relies on information included in the Proxy Statement, which is integral to the complaint. Plaintiff pleads the same underlying facts regarding corporate ownership, but they are spread throughout the SAC and Plaintiff's Opposition, as opposed to being collected in one place. *See e.g.,* SAC ¶¶ 43, 50, 55; Opposition at 11. Moreover, the SAC relies heavily on the Proxy Statement and it depends upon an alleged misstatement in the Proxy Statement. *See* SAC ¶¶ 40, 59. Accordingly, the Proxy Statement can be considered "integral" to the complaint, and may be considered on this motion to dismiss. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* discussion *supra* Section II.C.

11

purpose vehicle that directly purchased the Highpower shares, with an individual named Mr. Pan. *Id.* Defendant correctly argues that in order to hold Essence liable on an alter ego theory for a purchase made by its indirect, minority-owned subsidiary, HPJ Parent, Plaintiff must successfully pierce the corporate veil of each entity in the corporate chain between HPJ Parent and Essence. *See Capmark Fin. Group Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349 (S.D.N.Y. 2013) (requiring piercing of the veils separating each entity from a shared corporate parent). In other words, to reach Essence, Plaintiff first must successfully pierce the veil of HPJ Parent, then Essence SPC, and finally Essence Hong Kong.

To determine which jurisdiction's law to apply at each step of this analysis, the Court must look to the choice of law principles of the forum state. *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). In New York, the first step in a choice of law analysis is determining whether there is a conflict of laws whereby "the applicable law from each jurisdiction provides different substantive rules." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004). The New York law of corporate veil piercing assesses a long list of factors, including whether there was an absence of corporate formalities, whether funds were taken in and out of the corporation for personal rather than corporate purposes, and whether the corporation had property that was used by other corporations as if it were its own. *Sorter Techs., LLC v. IP Video Corp.,* 523 F. Supp. 3d 389, 412 (S.D.N.Y. 2021).[6]

---

[6] The full list of factors includes, "(1) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of

The other laws that might apply are those of the jurisdictions where Essence and its subsidiaries are incorporated, Hong Kong and the Cayman Islands. ECF No. 49 at 10–11. In both jurisdictions, the law of corporate veil piercing closely tracks English common law, which assesses whether a corporation is being interposed to evade or frustrate the enforcement of a pre-existing legal obligation. Declaration of Ben David Hobden ("Cayman Decl."), ECF No. 51 at 11; Declaration of James Todd Wood ("Hong Kong Decl."), ECF No. 52 at 11.[7] Because these substantive rules differ from New York law, there is a conflict of laws and New York's choice of law principles must be applied. *Int'l Bus. Machs. Corp.,* 363 F.3d 143.

"Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (cleaned up). Therefore, Plaintiff must pierce the corporate veil of HPJ

---

directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm['s] length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Sorter Techs.,* 523 F. Supp. 3d at 412.

[7] Under Rule 44.1, a court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *See also Wamai v. Industrial Bank of Korea*, 21-1956-CV, 2023 WL 2395675 at *3 (2d Cir. Mar. 8, 2023). Defendant filed attorney declarations describing the law of the Cayman Islands, ECF No. 51, and Hong Kong, ECF No. 52.

Parent under Cayman Islands law, of Essence SPC under Cayman Islands law, and finally of Essence Hong Kong under Hong Kong law. ECF No. 49 at 10–11.[8]

### B.    Veil Piercing Under Cayman Islands and Hong Kong Law

The first step in the veil piercing chain is HPJ Parent, an entity incorporated in the Cayman Islands. ECF No. 49 at 10. Defendant's declaration on Cayman Islands law cites to *Walkers (A Firm) v. Arnage Holdings Ltd and others* [2021 (1) CILR 347] at [70], for the assertion that the Cayman Islands Court of Appeal would apply English common law on veil piercing, including the U.K. Supreme Court decision in *Prest v. Petrodel Resources Ltd.* Cayman Decl. at 11. Although the *Walkers* decision found that *Prest* was inapposite, it cited *Prest* as authority on the subject of corporate veil piercing. *Walkers,* [2021 (1) CILR 347] at [70]. Plaintiff does not dispute that *Prest* provides the relevant standard under Cayman Islands law, but instead advances a different reading of *Prest.* Opposition at 8. Defendant's Hong Kong Declaration similarly identifies *Prest* as the controlling law in Hong

---

[8] Plaintiff contends that federal law should apply to the veil piercing analysis, citing *Kamen v. Kemper Financial Services*, 500 U.S. 90 (1991). Opposition at 6. Plaintiff argues that when a federal statute is silent on a corporate law point, courts should borrow state law only when doing so is consistent with the policies underlying the statue. *Id.* (*citing Kamen*, 500 U.S. at 98–99). In contrast, when a foreign rule would "frustrate" the policies of the statute, a federal common law rule should be fashioned. *Id.* Plaintiff's argument is unconvincing. *Kamen* is inapposite because it addressed a situation where a common law rule was "necessary to effectuate a private cause of action" under a federal statute. *Kamen*, 500 U.S. at 97. While veil piercing may be significant in this case, veil piercing is not "necessary" to Section 20A claims as a general matter. Moreover, *Kamen* notes that "[t]he presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards[,]" and that "[c]orporation law is one such area." *Id.* at 98.

Kong.  Hong Kong Decl. at 15.  Therefore, the undersigned considers *Prest* as providing the relevant standard under Cayman Islands and Hong Kong law.

In *Prest,* the Judgment of Lord Sumption reached the following conclusions.

> In my view, the principle that the court may be justified in piercing the corporate veil if a company's separate legal personality is being abused for the purpose of some relevant wrongdoing is well established in the authorities.  It is true that most of the statements of principle in the authorities are obiter, because the corporate veil was not pierced.  It is also true that most cases in which the corporate veil was pierced could have been decided on other grounds.  But the consensus that there are circumstances in which the court may pierce the corporate veil is impressive.  I would not for my part be willing to explain that consensus out of existence.  This is because I think that *the recognition of a limited power to pierce the corporate veil in carefully defined circumstances is necessary if the law is not to be disarmed in the face of abuse.*  I also think that provided the limits are recognised and respected, it is consistent with the general approach of English law to the problems raised by the use of legal concepts to defeat mandatory rules of law.
>
> The difficulty is to identify what is a relevant wrongdoing.  References to a "facade" or "sham" beg too many questions to provide a satisfactory answer.  It seems to me that two distinct principles lie behind these protean terms, and that much confusion has been caused by failing to distinguish between them.  They can conveniently be called the concealment principle and the evasion principle.  The concealment principle is legally banal and does not involve piercing the corporate veil at all.  It is that the interposition of a company or perhaps several companies so as to conceal the identity of the real actors will not deter the courts from identifying them, assuming that their identity is legally relevant.  In these cases the court is not disregarding the "facade", but only looking behind it to discover the facts which the corporate structure is concealing.  The evasion principle is different.  *It is that the court may disregard the corporate veil if there is a legal right against the person in control of it which exists independently of the company's involvement, and a company is interposed so that the separate legal personality of the company will defeat the right or frustrate its enforcement.*  Many cases will fall into both categories, but in some circumstances the difference between them may be critical.  This may be illustrated by reference to those cases in which the court has been thought, rightly or wrongly, to have pierced the corporate veil.

15

ECF No. 52-3 at 53 (*Prest v. Petrodel Resources Ltd.* [2013] UKSC 34, Judgment of Lord Sumption ¶¶ 27–28) (emphasis added). The court then discussed several cases that had been described – arguably incorrectly – as involving corporate veil piercing. These cases involved, *inter alia*, (1) a man who agreed to a non-compete provision, but then engaged in a competing business through a company partially owned by his wife, and (2) a man who agreed to sell a property, but then sold the same property to company that he owned and controlled to make it impossible for the purchaser to obtain specific performance. *Id.* ¶¶ 29, 30. After discussing these and other cases, the court concluded:

> These considerations reflect the broader principle that the corporate veil may be pierced *only to prevent the abuse of corporate legal personality.* It may be an abuse of the separate legal personality of a company to use it to evade the law or to frustrate its enforcement. *It is not an abuse to cause a legal liability to be incurred by the company in the first place. It is not an abuse to rely on the fact (if it is a fact) that a liability is not the controller's because it is the company's. On the contrary, that is what incorporation is all about.* Thus in a case like VTB Capital v Nutritek [2012] 2 Lloyd's Rep 313; [2013] 2 AC 337, where the argument was that the corporate veil should be pierced so as to make the controllers of a company jointly and severally liable on the company's contract, *the fundamental objection to the argument was that the principle was being invoked so as to create a new liability that would not otherwise exist.* The objection to that argument is obvious in the case of a consensual liability under a contract, where the ostensible contracting parties never intended that any one else should be party to it. But the objection would have been just as strong if the liability in question had not been consensual.
>
> I conclude that there is a limited principle of English law which applies when a person is *under an existing legal obligation or liability* or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates *by interposing a company under his control.* The court may then pierce the corporate veil for the purpose, and only for the purpose, of depriving the company or its controller of the advantage that they would otherwise have obtained by the company's separate legal personality.

16

*Id.* ¶¶ 34–35 (emphasis added).

Defendant argues that because Essence and its subsidiaries, including HPJ Parent, were not "injected into the corporate structure" after the Merger, *Prest* precludes piercing the corporate veil for any liability that arose at the time of the Merger. ECF No. 49 at 21. Plaintiff counters that the dispositive question is whether a corporation was used to evade an existing legal obligation, not whether the corporation only came into existence after creation of the relevant legal obligation. Opposition at 7–8. Here, Plaintiff claims the relevant legal obligation is Essence's duty to abstain from trading or to disclose the information before trading when it came into possession of material non-public information. *Id.* at 8.

Neither reading of *Prest* is completely accurate, although Defendant's reading is more faithful to that decision. The decision focused on whether a company was somehow "interposed" to deliberately frustrate a legal liability or obligation of the person controlling the company that existed independently of the company's involvement. ECF No. 52-3 at 55–56 (*Prest* Judgment of Lord Sumption ¶¶ 34-35). Thus, Plaintiff's interpretation of *Prest*, which would allow disregarding the corporate form to ensure general compliance with law, is not correct. *See* Opposition at 8. If it were, piercing the corporate veil would not be as rare as the U.K. Supreme Court described it. *See* ECF No. 52-3 at 53 (*Prest* Judgment of Lord Sumption ¶¶ 27–28). Instead, the corporation must be "interposed" in some way to thwart enforcement of a specific, existing legal liability. *Id.* ¶¶ 34–35. Applying the narrow view of corporate veil piercing described in *Prest*, the relevant legal liability

17

here is the one that allegedly arose at the time Plaintiff's stock was purchased. This was a liability of HPJ Parent, not a liability of any entity alleged to control HPJ Parent. Moreover, Plaintiff does not allege that any of Essence's subsidiaries were "interposed" to avoid this liability or to frustrate its enforcement. Instead, Defendant is relying on the fact that the Section 20A liability "is not the controller's because it is [HPJ Parent's]," which *Prest* did not consider to be an abuse of the corporate form.[9] Accordingly, Plaintiff's allegations in support of corporate veil piercing fail under Cayman Islands law. Because Hong Kong follows the English common law rule just like the Cayman Islands, Plaintiff's allegations fail at each step of the veil piercing chain. *See* Hong Kong Decl. Therefore, Plaintiff's veil piercing claims should be dismissed.

## C.   Agency Should be Assessed Under New York Law

Plaintiff alleges a two-step agency chain: HPJ Parent acted as Essence Capital's agent in executing the stock purchase, and Essence Capital acted as Essence's agent. Opposition at 3. Plaintiff asserts that New York law applies but provides little supporting analysis. *Id.* at 9. Defendant asserts that Hong Kong law applies. ECF 49 at 25–27. Because New York's choice of law rules require there to be a conflict between the laws of the relevant jurisdictions before New York's choice of law rule is applied, the first question is whether Hong Kong and New York

---

[9] Plaintiff raises a potential argument based on *Prest's* discussion of the "concealment principle," which courts may use to determine the true identity of individuals hiding behind a company or several companies. ECF No. 52-3 at 53 (*Prest* Judgment of Lord Sumption ¶28); Opposition at 8. But it is unclear how this principle can apply where, as here, the relevant corporate structure is fully disclosed.

agency law conflict. *Int'l Bus. Machs. Corp.*, 363 F.3d at 143. As Plaintiff points out, Defendant fails to identify a conflict between these laws. ECF No. 49 at 25. Accordingly, absent an identified conflict, New York law should apply. *Int'l Bus. Machs. Corp.*, 363 F.3d at 143. ("In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.")

### D.    Plaintiff Fails to Plead Agency Under New York Law

The two principal-agent relationships Plaintiff alleges are between Essence and Essence Capital, and between Essence Capital and HPJ Parent. Opposition at 3. Under New York law, an agency relationship exists where there is "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking." *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 321 (S.D.N.Y. 2019) (internal quotations omitted); *see also Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 69 A.D.3d 71, 96–97 (1st Dep't 2009).[10]

Plaintiff's complaint fails to include sufficient facts to plead an agency relationship either between Essence and Essence Capital or between Essence

---

[10] Under Hong Kong law, which follows English common law, "agency is the fiduciary relationship which exists between two persons, one of whom expressly or impliedly manifests assent that the other should act on his behalf so as to affect his relations with third parties, and the other of whom similarly manifests assent so to act or so acts pursuant to the manifestation." Hong Kong Decl. at 16 (citing to *Bowstead & Reynolds on Agency* 23rd ed.). This rule appears similar to New York law and neither side identifies a relevant difference.

Capital and HPJ Parent, although the first question is closer.  For Essence Capital,

Plaintiff alleges that:

> During the meetings internally held by Essence in or around June
> 2019, Essence designated its subsidiary, Essence International
> Capital, to act in its interest as the financing provider for the Merger.
> Essence International Capital did not hold independent board
> meetings regarding the provision of funding to HPJ Parent Limited.

SAC ¶ 46.  Plaintiff alleges that in meetings held around June 2019, there was a

manifestation that Essence Capital would provide financing on behalf of Essence.

*Id.*  Essence Capital then did provide financing, which is alleged to constitute

accepting the undertaking.  *Id.* at ¶ 22.  As to the critical element of an agreement

regarding control, Plaintiff alleges that the board of Essence Capital did not hold

any independent decision-making meetings regarding the financing arrangement,

which demonstrated that Essence was in control of the decision, with Essence

Capital simply acting at Essence's direction.  *Id.* at ¶ 46.  But Plaintiff does not

identify any affirmative action by Essence (other than the conclusory allegation that

it "designated" Essence Capital to provide financing) by which it exercised control

over Essence Capital.  Instead, the SAC relies on the alleged absence of an

independent decision made by Essence Capital, without explaining the basis for

making this allegation.

   In support of the sufficiency of these allegations, Plaintiff cites *In re*

*Parmalat Securities Litigation*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005), which held

that plaintiffs sufficiently alleged an agency relationship between affiliates of two

global accounting firms.  But the complaint in *Parmalat* included factual allegations

about specific actions taken by the alleged principals to exert control over how the

alleged agents conducted the audits that were the subject of that litigation.  *See* 357 F. Supp. 2d at 294-96, 299-302.  In contrast, Plaintiff cites no specific actions evidencing an understanding that Essence was to be in control of the undertaking, *i.e.*, the financing of the Merger.  Even reading the SAC generously and drawing all reasonable inferences in Plaintiff's favor, these allegations are not sufficient to plead an agency relationship, as opposed to an ordinary parent-subsidiary relationship, between Essence and Essence Capital as to the provision of financing.

Additionally, Plaintiff fails to plead sufficient facts regarding the relationship between Essence Capital and HPJ Parent.  The Second Amended Complaint alleges that Essence Capital provided the financing for the Merger, that its directors overlapped with HPJ Parent's and at times signed documents for both HPJ Parent and Essence Capital, and that after the Merger, Essence Capital held a controlling interest in HPJ Parent.  SAC ¶¶ 45, 56–60.  First, New York courts have held that overlapping directors and ownership interests are not sufficient to establish agency. *Rotoli v. Domtar, Inc.*, 224 A.D.2d 939, 940 (4th Dep't 1996).  Second, whether agency can be found depends upon "the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship." *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, 03-CV-613, 2004 WL 112948, *4 (S.D.N.Y. Jan. 22, 2004) (citing *Manchester Equipment Co., Inc. v. Am. Way and Moving Co., Inc.*, 60 F. Supp. 2d 3, 8 (E.D.N.Y. 1999)).

Plaintiff fails to allege any interactions or occurrences that show that Essence Capital directed HPJ Parent to act as its agent in purchasing the

21

Highpower shares.  Plaintiff alleges that Essence Capital "controlled" HPJ parent by providing financing and through the equity commitment letter.  Opposition at 4–5.  Providing financing, by itself, does not constitute the exercise of control.  Further, Defendant asserts, and Plaintiff does not dispute, that the equity commitment letter was enforceable only by HPJ Parent or Highpower, giving Essence Capital no control over HPJ Parent.  ECF No. 60 at 9; Opposition at 10.[11]  Absent non-conclusory factual allegations of manifestation, acceptance, and control, Plaintiff fails to plead that HPJ Parent was the agent of Essence Capital for purchasing Plaintiff's shares.  *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 321.  Accordingly, Plaintiff's agency allegations are insufficient.

## IV.    PLAINTIFF'S REQUEST TO FILE A THIRD AMENDED COMPLAINT

Plaintiff requests leave to file a Third Amended Complaint, or in the alternative, leave to amend his Second Amended Complaint to add a common law fraudulent misrepresentation claim.  ECF No. 65 at 1.  Defendant opposes the amendment as futile.

Defendant correctly asserts that when causes accrue outside of New York and the plaintiff is not a resident of New York, the law "borrows" the statute of limitations from the jurisdiction where the claim arose.  ECF No. 60 at 14 (citing *Norex Petroleum Ltd. v. Blavatnik*, 23 N.Y.3d 665, 668 (2014)); N.Y. C.P.L.R. § 202.  Under New York law, fraud claims accrue where the loss resulting from the fraud is

---

[11] Indeed, the equity commitment letter is filed in the record at ECF No. 61-1, and a review of it confirms that it "may only be enforced (i) by [HPJ] Parent or (ii), to the extent that [Highpower] has obtained an order of specific performance . . . by [Highpower][.]"  ECF No. 61-1 at 2.

sustained.  *Prefabco, Inc. v. Olin Corp.*, 71 A.D.2d 587, 588 (1st Dep't 1979);

*Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*, 34 N.Y.3d 327, 335 (2019)

("[W]hen an alleged injury is purely economic, the place of injury usually is where

the plaintiff resides and sustains the economic impact of the loss.") (citations

omitted).

Because Plaintiff is a California resident, California is where the cause

accrued.  SAC ¶ 12.  California law requires fraud claims to be brought within three

years of "the discovery, by the aggrieved party, of the facts constituting the fraud or

mistake."  Cal. Civ. Proc. § 338(d).  Plaintiff states he could not have discovered the

fraud through reasonable diligence until July 28, 2023, when the Second Amended

Complaint in a Delaware proceeding was filed.  ECF No. 65 at 2.  Defendant

counters that Plaintiff was on notice of a claim that the Proxy Statement was

fraudulent either by an August 2020 Delaware class action complaint or,

alternatively, by China Securities Regulatory Commission (CSRC) filings made in

January and June of 2021.  ECF No. 67 at 2.

Defendant fails to identify allegations about a concrete plan to relist the

Company in the 2020 Delaware complaint, citing only to paragraphs that discuss

how Chinese companies, in general, often follow take private transactions with a re-

listing in China, and that Highpower "appear[ed] to be" following this trend.  *Id.*

(citing ECF No. 22, Ex. 17 ¶¶22, 27, 29 ).  Absent any facts specific to the plan to

relist Highpower, the 2020 Delaware complaint is insufficient to put Plaintiff on

notice of the alleged fraud.

On the other hand, Defendant's assertion that the CSRC filings put Plaintiff on notice of the alleged fraud are meritorious. *Id.* A filing published in January 2021 stated that Shenzhen Highpower[12] planned to conduct an initial public offering and that Essence Securities would help to facilitate the IPO. *See* ECF No. 22, Ex. 7. In June 2021, a prospectus concerning the IPO was also published, reinforcing that there would be a public listing of the company. *Id.*; Ex. 8. In cases interpreting the fraud statute of limitations, California courts have held that, "plaintiffs are charged with presumptive knowledge of an injury if they have information of circumstances to put them on inquiry or if they have the opportunity to obtain knowledge from sources open to their investigation." *Doe v. Roman Catholic Bishop of Sacramento*, 117 Cal. Rptr. 3d 597, 602 (Ct. App. 2010) (cleaned up); *see also Kline v. Turner*, 105 Cal. Rptr. 2d 699, 702 (Ct. App. 2001) ("[When the plaintiff has . . . the opportunity to obtain knowledge from sources open to her investigation (such as public records or corporation books), the statute commences to run.") (internal brackets omitted). Because the CSRC filings were public, Plaintiff had the opportunity to obtain knowledge of the planned re-listing.

The public announcement that the re-organized Highpower would undertake an IPO with the assistance of Essence's parent company placed Plaintiff on notice that the Proxy Statement's assertion that there was no plan to re-list could have been fraudulent. To begin running of the limitations period, a plaintiff does not

---

[12] Plaintiff alleges that Shenzhen Highpower was a subsidiary of Highpower that was designated the holding company of the Highpower group to comply with regulatory requirements in China. SAC ¶ 31.

24

need to know each fact constituting the fraud, he need only discover "facts that would lead a reasonably prudent person to suspect fraud." *State of Cal. ex rel. Metz v. CCC Info. Servs., Inc.,* 57 Cal. Rptr. 3d 156, 166 (Ct. App. 2007); *see also In re Infonet Servs. Corp. Sec. Litig.,* 310 F. Supp. 2d 1106, 1119 (C.D. Cal. 2003) ("Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.") (citation omitted). The short period between the Merger and disclosure of the planned relisting in China, as well as the involvement of the parent company of the same entities that participated in the Merger, would lead a reasonably prudent person to suspect that a plan may have been in place at the time of the Merger. Because Plaintiff should have suspected the fraud when the first CSRC filing was published in January 2021, and certainly by the time the prospectus was filed in June 2021, the statute of limitations period started running by that point. ECF No. 22, Ex. 7.[13]

Because Plaintiff did not commence this action until October 2024, more than three years after the January 2021 filing, his common law fraud claims are time-barred. ECF No. 1; Cal. Civ. Proc. § 338(d). Therefore, Plaintiff should not be

---

[13] Plaintiff also asserts that his claim is timely under the doctrine of fraudulent concealment but fails to support this assertion. ECF No. 65 at 2. Even assuming there was active concealment, the existence of a January 2021 *public* filing about the relisting precludes reliance on the doctrine of fraudulent concealment after that point. *MGA Ent., Inc. v. Mattel, Inc.,* 254 Cal. Rptr. 3d 314, 319–320 (Ct. App. 2019) ("the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only . . . until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it."); *Rita M. v. Roman Catholic Archbishop,* 232 Cal. Rptr. 685, 690 (Ct. App. 1986) (The doctrine of fraudulent concealment for tolling the statute of limitations does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim.") (cleaned up).

25

granted leave to amend on the ground that doing so would be futile. *421-A Tenants Ass'n, Inc. v. 125 Ct. St. LLC*, 760 F. App'x 44, 51 (2d Cir. 2019).

## V.   CONCLUSION

For the reasons described above, the undersigned respectfully **RECOMMENDS** that Essence's Motion to Dismiss be **GRANTED** and Plaintiff's request for leave to file a Third Amended Complaint be **DENIED.**

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. *See* Fed. R. Civ. P. 6(a), (b), (d). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni, United States Courthouse, 500 Pearl Street, New York, New York 10007-1312. Any requests for an extension of time for filing objections must be directed to Judge Caproni.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: May 19, 2026
     New York, New York

_____

Henry J. Ricardo
United States Magistrate Judge